IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 24, 2018 Session

## STATE OF TENNESSEE v. JOHN PALLADIN GIBSON

**Appeal from the Criminal Court for Knox County**
**No. 105492    Steven W. Sword, Judge**

_____

### No. E2017-01567-CCA-R3-CD

_____

The Defendant, John Palladin Gibson, was convicted of two counts of driving under the influence (DUI), Class A misdemeanors; two counts of fourth-offense DUI, Class E felonies; and one count of second or subsequent offense driving on a cancelled, suspended, or revoked license, a Class A misdemeanor. *See* T.C.A. §§ 55-10-401 (2013) (amended 2015) (DUI), 55-10-402(a)(4) (2013) (amended 2014, 2015, 2016) (fourth-offense DUI), 55-50-504 (2013) (amended 2016) (driving while privilege cancelled, suspended, or revoked). The trial court merged the DUI convictions and sentenced the Defendant, a career offender, to six years for DUI and eleven months, twenty-nine days for driving on a revoked license. The sentences were imposed concurrently. On appeal, the Defendant contends that the trial court erred in (1) admitting blood tests results without sufficient proof of the chain of custody and (2) denying his ineffective assistance of counsel claim related to his trial counsel's alleged failure to review evidence with him, causing him to reject a plea offer that he would have accepted if he had been aware of the evidence. We reverse the DUI convictions and remand for a new trial, and we affirm the driving on a revoked license conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. TIMOTHY L. EASTER, J., filed an opinion concurring in part and dissenting in part.

Joshua Hedrick (on appeal, at sentencing hearing, and at motion for new trial), Knoxville, Tennessee; Mark Stephens (at trial), District Public Defender; Denise Faili (at trial), Nakeisha Jackson (at trial), and Jonathan Harwell (at trial), Assistant District Public Defenders, for the appellant, John Palladin Gibson.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; Joe Welker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At the trial, Knox County Sheriff's Deputy Joseph Sulewski testified that on September 13, 2013, he was dispatched to a Pilot convenience store following a report of an intoxicated man who had tried to use another person's credit card. Deputy Sulewski said that when he arrived, he saw the Defendant sitting in the driver's seat of a blue Chrysler Sebring with its lights illuminated. Deputy Sulewski said that the car's engine was running and that he smelled alcohol immediately upon approaching the Defendant. Deputy Sulewski said that the Defendant's speech was "slurred and mumbly" and that the Defendant swayed and had to use the car for support. Deputy Sulewski said that the Defendant fumbled to retrieve his driver's license and that the Defendant tried to give Deputy Sulewski an insurance card instead of a driver's license. Deputy Sulewski said that the Defendant stated he had come from Loudon County in the Defendant's girlfriend's car and that his girlfriend was at home. Deputy Sulewski said the Defendant claimed the credit card he had attempted to use belonged to his girlfriend. Deputy Sulewski said that the Defendant stated that his driver's license had been revoked and that Deputy Sulewski confirmed this information by checking the status of the Defendant's license. A certified copy of a document stating that the Defendant's driver's license had been revoked was received as an exhibit. Deputy Sulewski said that during his encounter with the Defendant at Pilot and at UT Hospital, the Defendant drank soda but did not drink alcohol.

Deputy Sulewski testified that the Defendant stated he had consumed a Long Island iced tea cocktail and three twenty-four-ounce beers. Deputy Sulewski said that the Defendant performed poorly on walk-and-turn and one-legged-stand field sobriety tests and that the Defendant swayed during the horizontal gaze nystagmus test. Deputy Sulewski said that the Defendant asked if he could smoke and that Deputy Sulewski initially said he did not care if the Defendant smoked but later asked the Defendant not to smoke near the gas pumps. Deputy Sulewski said that after he asked the Defendant not to smoke, the Defendant lit another cigarette and that Deputy Sulewski handcuffed the Defendant for safety reasons because the Defendant did not follow instructions regarding smoking. Deputy Sulewski said that he looked inside the car in which the Defendant had been sitting but did not see any evidence of alcohol.

Deputy Sulewski testified that after he arrested the Defendant, he took the Defendant to UT Hospital for collection of a blood sample, to which the Defendant consented. Deputy Sulewski testified that he observed the technician collect the blood sample and place it in the Tennessee Bureau of Investigation (TBI) blood test kit. He

-2-

said that he enclosed the necessary documentation and sealed and initialed the box. He said he provided the sealed box to the Knox County Sheriff's Forensic Department. Regarding the Forensic Department's disposition of the sample box, Deputy Sulewski said, "[T]hey sent it off to the TBI, I guess." He did not recall the name of the person in the Forensic Department to whom he gave the box. Regarding what happened to the box after he delivered it to the Forensic Department, he said, "I hand it to them, and it's in their custody. . . . I am done with it."

Deputy Sulewski testified that his encounter with the Defendant was recorded by the video recorder in his police cruiser. Portions of the recording were played for the jury. Deputy Sulewski testified that a time stamp on the recording reflected that the events occurred about 12:50 a.m. The recording included the field sobriety tests. Deputy Sulewski said that in a portion of the recording made after they arrived at the hospital contained the Defendant's statements that the Defendant might be "too drunk" and that the Defendant did not want to fall.

When shown a report he prepared, Deputy Sulewski agreed that he had said the Defendant had positioned the car properly and in a way that did not obstruct traffic. He agreed that he had described the Defendant as polite and cooperative. Deputy Sulewski agreed that he had stated the Defendant had slurred speech and that he was not familiar with the Defendant's speech patterns from any prior acquaintance. Deputy Sulewski agreed that the Defendant "almost fell onto the gas pump" during the walk-and-turn test. Deputy Sulewski acknowledged that he did not see the Defendant driving or ask a Pilot employee with whom he spoke about whether the employee had seen the Defendant driving. Deputy Sulewski agreed that when he asked if the Defendant had any medical issues that might interfere with his ability to perform the field sobriety tests, the Defendant had stated that he suffered from seizures. Deputy Sulewski agreed that a person with a neurological issue might not perform well on the horizontal gaze nystagmus test.

TBI Special Agent Forensic Scientist Stephanie Dotson, a forensic toxicology expert, testified that she performed a blood-alcohol analysis on a sample submitted from the Defendant. She said the sample was left in a drop box in the TBI laboratory's secured lobby. She said that the TBI maintained a log book signed by individuals who brought evidence to the laboratory but that she did not check the log book for the name of the person who brought the evidence to the laboratory in this case. She said that the box could be accessed to deposit items but that the items could only be removed by a forensic technician, in this case Debra White, who placed the items in a vault until they were opened for processing. Agent Dotson said the box containing the Defendant's blood sample was sealed when it was received in the laboratory. She said that documentation and two tubes of blood were received per case, that each case had a unique laboratory number, and that a bar code sticker with the laboratory number was attached to each tube.

-3-

She said that the laboratory received the sample in this case on September 19, 2013, at 4:30 p.m. She said that the sample was labeled with the Defendant's name and that the date of collection was September 13, 2013, at 2:05 a.m. She said the request form was completed by Deputy Sulewski. Agent Dotson said that the documentation reflected that Ashley Young or Yang collected the blood but that Agent Dotson had no personal knowledge of the person who collected the blood or the person's qualifications. She did not know how many individuals handled the box in which the sample was stored or if the sample was refrigerated before it reached the laboratory. She said that the tubes in the kit contained a preservative and an anticoagulant. She said her notes did not reflect that the sample was clotted when she received it.

Agent Dotson testified that the blood-alcohol content of the blood submitted for analysis in this case was 0.08 gram percent. She said that the sample was analyzed twice, showing values of 0.0885 and 0.0873 gram percent, that the lower value was used, and that the decimal amount was truncated to two digits. She said that alcohol is absorbed by the body for thirty minutes to one hour until it reaches its peak level and that it was eliminated by the body at a rate of 0.01 to 0.02 gram percent per hour. She said the rate of absorption and elimination of alcohol varied based upon gender, weight, food eaten, and other factors. She said that if a person did not drink for eight hours, the person's blood-alcohol level would decrease and that eating would slow the absorption of alcohol but might not affect the liver's metabolism of alcohol.

Agent Dotson stated that, in her opinion, a 150-pound person who drank five alcoholic beverages would have a blood-alcohol level less than 0.08 gram percent seven hours later. She acknowledged that fermentation producing alcohol might occur in the tubes in which the samples were stored if they did not contain an adequate amount of preservative but stated this was "very, very unlikely." She said that any rubbing alcohol, also known as isopropyl alcohol, used in the sample collection process would not affect the accuracy of the blood-alcohol test, which tested for and differentiated ethyl alcohol. She acknowledged a directive on the blood-alcohol test kit which stated that a nonalcoholic skin preparation should be used in collecting a sample and stated that this was "just a suggestion" to ensure that no issues arose. She said that due to the laboratory's backlog, she analyzed the blood about two months after the sample was collected. She said that the blood sample was destroyed on April 30, 2014.

Agent Dotson's report was received as an exhibit. It reflected that the Defendant's blood sample was received "Via: BA Kit Drop Box" from "Knox Co S.D." by Deborah White on September 19, 2013. It stated that the blood-alcohol content of the sample was 0.08 gram percent.

The Defendant elected not to present evidence. The jury found the Defendant guilty of the charged offenses of two counts of driving under the influence (DUI). *See*

T.C.A. § 55-10-401(a)(1) (2013) (amended 2015) (driving or being in physical control of a motor vehicle while under the influence such that the driver's ability to safely operate a motor vehicle is impaired), (a)(2) (driving or being in physical control of a motor vehicle with a blood-alcohol concentration of 0.08 percent or greater) ("DUI per se"). The jury also found the Defendant guilty of driving on a revoked license. The trial court then conducted additional proceedings regarding the question of the Defendant's guilt of the remaining charges, two counts of fourth or subsequent offense DUI and one count of second or subsequent offense driving on a suspended, cancelled, or revoked license.

The State offered as exhibits certified copies of: (1) the Defendant's driving history prepared by the Tennessee Department of Safety and Homeland Security, (2) the Defendant's administrative motor vehicle report prepared by the Department of Safety and Homeland Security, (3) a Davidson County General Sessions Court document reflecting that on March 1, 2005, the court accepted the Defendant's guilty plea to DUI occurring on an unspecified date relative to warrant number GS192662, (4) a document reflecting a judgment in case number 134829-09-CR-2068 for second offense DUI occurring on August 8, 2009, and (5) documents, including a judgment, related to the Defendant's Loudon County conviction of "DUI – multiple offenses" occurring on November 26, 2011.

The jury found the Defendant guilty of both counts of fourth or subsequent offense DUI and guilty of second or subsequent offense driving on a suspended, cancelled, or revoked license. The trial court merged the DUI convictions and sentenced the Defendant, a career offender, to six years for fourth or subsequent offense DUI and to eleven months, twenty-nine days for driving on a revoked license. The sentences were imposed concurrently.

After the trial but before the sentencing hearing, trial counsel was permitted to withdraw, and new counsel was appointed, who represented the Defendant at the sentencing hearing and in the motion for a new trial proceedings. The issues raised in the motion for a new trial included an allegation of ineffective assistance of trial counsel.

At the hearing on the motion for a new trial, the Defendant testified that he had received a pretrial plea offer. He said that trial counsel had explained the plea offer to him and that they had discussed it. He agreed that the offer involved a more favorable sentence than he faced if he were convicted at a trial. He agreed that trial counsel had advised him not to accept the offer and that he had decided to reject the offer and go to trial. He stated that he had wanted to see the video recording from Deputy Sulewski's cruiser's recording equipment, that he did not see the recording before the trial, and that he would have accepted the offer "in a heartbeat" if he had seen the recording before the trial. He stated that his trial counsel told him she did not have the recording and that he did not see it until it was shown to the jury during the trial. He said that when he saw the

recording at the trial, he knew the case was lost and said he "[a]bsolutely" would have accepted the plea offer if he had seen the recording.

The Defendant testified that he had an attorney other than trial counsel for "the Walmart burglary," that the attorney in the Walmart case brought a video recording from Walmart for him to view, and that he told this attorney he wanted to see the recording from the DUI case. He also said he told his attorney in the present case that he wanted to see the recording related to this case. He said the attorneys were "flip-flopping" his cases and that "we [were] never on the same page." The court stated that the attorney who represented the Defendant in the Walmart case was deceased at the time of the motion for a new trial hearing. The Defendant agreed that a different attorney had represented him in the present case in general sessions court and that trial counsel had represented him once the case was transferred to criminal court.

The Defendant testified that trial counsel explained the sentence and release eligibility terms of the plea agreement and the sentence the Defendant faced if he chose to go to trial. He said the plea offer included a sentence of four years to be served at forty-five percent release eligibility. He said counsel told him they had a "really good chance of winning" and advised him not to accept the offer. He said he missed an appointment with counsel because he was in jail for the Walmart case and that she was supposed to show him the video recording in this case while he was in jail but that she did not. He said he wanted to see the recording before the trial. He said, as well, that he thought he would receive another plea offer before the trial but that counsel advised him, "You ain't getting no more offers." He did not recall if he knew at the time of the plea offer that if he were convicted in the Walmart case, the sentence would have to be served consecutively to any sentence in the present case.

The Defendant testified that he remembered the events depicted on the recording "real well." He said, though, that he remembered the events after watching the recording and that, "I didn't remember it like I thought I did prior." He stated that the jury had not heard him speak previously and was unaware of his speech impediment. He said that if he took a field sobriety test "right now completely sober," he would probably fail, "but not as bad as I did on that tape." He said that he was surprised by his appearance on the recording and that he did not recall appearing as impaired as depicted on the recording. He said, "[I]f I was the jury on the panel, I would say I was guilty of DUI." He said he did not remember all of the details of the relevant events and stated that he "really didn't remember" going to the hospital for the collection of the blood sample. He said he thought the blood sample had been collected at the jail.

The Defendant testified that he was unaware before the trial that the trial court had denied the motion to suppress. He said that when the trial began, he thought "the whole thing was going to be threw [sic] out because . . . the blood work was lost[.]" He

explained, however, that trial counsel had stated that she had filed a motion to exclude the evidence and that she thought the motion would be granted but "never said for a fact."

The prosecutor and defense counsel agreed on the record that trial counsel had died before the motion for a new trial hearing, and the trial court acknowledged the accuracy of this fact. After receiving the proof, the trial court found that trial counsel's failure to show the video recording to the Defendant before the trial was deficient performance but that the Defendant had not proven that he would have accepted the plea offer. Thus, the court concluded that the Defendant had not established ineffective assistance of counsel, and the court denied the motion for a new trial. This appeal followed.

# I

## Admission of Evidence

The Defendant contends that the trial court erred in admitting the results of the blood-alcohol test because the State failed prove an adequate chain of custody of the blood sample. The State counters that the trial court did not abuse its discretion. We conclude that the State failed to show an unbroken chain of custody, that the trial court erred in admitting the blood-alcohol evidence, and that the error was harmful as to all counts of the indictment except the one which charged the Defendant with driving while his privilege to do so was suspended, cancelled, or revoked.

The record reflects that the Defendant filed a pretrial Motion to Dismiss the Indictment for Failure to Preserve Blood Specimen or Motion to Suppress Blood Specimen and Corresponding Toxicology Results. *See* T.C.A. § 55-10-408(e) (2013) (amended 2017) ("The person tested shall be entitled to have an additional sample of blood or urine procured and the resulting test performed by any medical laboratory of that person's own choosing and at that person's own expense; provided, that the medical laboratory is licensed pursuant to title 68, chapter 29."). The Defendant contended that the State had destroyed potentially exculpatory evidence and that his due process right to a fair trial could not be ensured. The Defendant relied upon constitutional principles, Code section 55-10-408, *Brady v. Maryland*, 373 U.S. 83 (1963), *State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999) (setting forth the analytical framework for determining whether the loss or destruction of evidence deprived a defendant of a fair trial), and *State v. Merriman*, 410 S.W.3d 779 (Tenn. 2013) (applying *Ferguson* and clarifying the standard of appellate review). On appeal, however, the Defendant contends that the trial court erred in admitting the blood-alcohol content evidence at the trial based on inadequate proof of the chain of custody. He has not raised the constitutional issue on appeal, and our review is limited to the trial court's evidentiary ruling regarding the adequacy of the chain of custody.

Tennessee Rule of Evidence 901 states that evidence must be authenticated in order to be admissible. Evidence is authenticated by providing proof "sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence," it should be admitted. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008). In order to prove the reliability of tangible evidence, the State must prove "an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (internal citation omitted). Relative to the State's burden in proving the chain of custody, our supreme court has stated the following:

> Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond the possibility of all doubt; nor should the State be required to establish facts which exclude every possibility of tampering . . . . An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item . . . . [If] the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen, et al., *Tennessee Law of Evidence* § 901.12, at 624 (3rd ed. 1995)).

*Cannon*, 254 S.W.3d at 296. This court reviews chain of custody determinations for an abuse of discretion. *Id.* at 295.

The Defendant argues that the State failed to offer proof of the standard procedures for storing evidence, of how the evidence was kept between its collection and the time it was received at the TBI laboratory, of the integrity and condition of the box containing the evidence when it was received at the TBI laboratory, and of the absence of mishandling or mislabeling at the TBI laboratory. He urges this court to conclude that the trial court erred in concluding that an adequate chain of custody was shown.

In support of his argument, the Defendant relies upon *State v. Reginald Bernard Coffee*, No. M2016-01834-CCA-R3-CD, 2017 WL 3836023, at *12-15 (Tenn. Crim. App. Aug. 31, 2017), *perm. app. denied* (Tenn. Jan. 17, 2018). In that case, a detective testified that he saw two other officers collect fingerprint evidence, but neither of the collecting officers testified. The detective testified that all evidence was placed into an evidence locker but did not testify regarding any logging procedure employed, nor did he explain who had access to the locker. The expert who performed the fingerprint analysis testified about having received the evidence in the latent fingerprint division, although an

envelope containing the evidence reflected that a person other than the witness first received the evidence in the latent fingerprint division. The State failed to present any proof regarding the whereabouts and the security of the evidence between its collection at 7:10 a.m., an officer's counting the fingerprint cards containing the evidence at 3:30 p.m. that day, and receipt of the evidence in the latent fingerprint division at 5:30 a.m. the next day. The State failed to offer proof, as well, that the evidence was properly sealed when the expert received it for testing. The envelope containing the evidence, which was a trial exhibit, "was split open on one side," contained multiple sets of initials, and the cards containing the fingerprint evidence contained the initials of the expert and the illegible initials of another person who could not be identified other than as having possibly been the expert's supervisor. In "the absence of testimony about standard procedures for handling, storing, and transporting fingerprint evidence," this court concluded that it could not know whether the evidence had been tampered with or whether anyone had confused, misplaced, damaged, substituted, lost, or replaced the fingerprint cards. *Reginald Bernard Coffee*, 2017 WL 3836023, at *15; *see Scott*, 33 S.W.3d at 761. This court concluded that the chain of custody was not sufficiently proven and that the trial court erred in admitting the evidence, although this court deemed the error harmless in view of the other evidence of the Defendant's guilt. *See Reginald Bernard Coffee,* 2017 WL 3836023, at *15.

In the present case, the chain-of-custody evidence shows the following: Deputy Sulewski took the Defendant to UT Hospital, where the blood sample was collected in Deputy Sulewski's presence. Deputy Sulewski sealed it in an evidence kit. Deputy Sulewski submitted the sample to the Knox County Sheriff's Department Forensic Department. The TBI Laboratory received the evidence from the Knox County Sheriff's Department six days after its collection. When the evidence was received, it was sealed in an evidence kit. It was stored securely by the TBI Laboratory until the kit was opened and prepared for testing by Debra White, and it was then tested by Special Agent Dotson.

The State did not offer any evidence to show the location of and conditions in which the evidence was kept between Deputy Sulewski's delivering it to an unidentified person from the Forensics Department and the TBI Laboratory's receipt of it from the Sheriff's Department. Although the State was not required to present the testimony of every witness who handled the evidence, it is required to show the identity and integrity of the evidence as a predicate to its admissibility. *See Cannon*, 254 S.W.3d at 296; *Scott*, 33 S.W.3d at 760. In the present case, the State failed to show an unbroken chain of custody. *Scott*, 33 S.W.3d at 760. The evidence does not support the trial court's determination that the State established a sufficient chain of custody. We conclude that the trial court erred in admitting the evidence.

In reaching this conclusion, we have considered the cases cited by the State, *State v. Earnest Laning*, No. E2011-01882-CCA-R3-CD, 2012 WL 3158782 (Tenn. Crim.

App. Aug. 6, 2012); *State v. Michael Joseph Arbuckle*, No. M2000-02885-CCA-R3-CD, 2001 WL 1545494 (Tenn. Crim. App. Dec. 5, 2001), *perm. app. denied* (Tenn. May 28, 2002); and *State v. Pascasio Martinez*, No. E2016-01401-CCA-R3-CD, 2017 WL 5613976 (Tenn. Crim. App. Nov. 21, 2017), *perm. app. denied* (Tenn. Mar. 15, 2018).

In *Earnest Laning*, the arresting officer witnessed the blood being drawn, put the tubes containing the sample in a bag, sealed the bag, completed paperwork attendant to the sample, placed the bag and the paperwork in a box, and sealed the box, which he dated and initialed. The officer placed the sealed box in a locked evidence refrigerator, and he testified that the sample could only be removed by the evidence custodian but that he did not know whether the sample was mailed or hand-delivered to the TBI Laboratory. A TBI agent testified about the procedures followed within the laboratory upon receipt of the sample. The trial court held that the State established an adequate chain of custody, and this court concluded that the trial court had not abused its discretion. *Earnest Laning*, 2012 WL 3158782, at *3.

Similarly, in *Michael Joseph Arbuckle*, police officers testified about the collection of the sample and its sealing in a protective box. One of the officers testified that he placed the box in the police evidence locker to be mailed to the TBI Laboratory. A TBI agent testified about the laboratory's procedures for receiving and documenting evidence. This court held that the trial court did not abuse its discretion in determining that the State established an adequate chain of custody and in admitting the evidence. *Michael Joseph Arbuckle*, 2001 WL 1545494, at *3.

In *Pascasio Martinez*, a police officer testified that a hospital phlebotomist collected a blood sample from the defendant, attached the defendant's identifying information to the tubes containing the sample, sealed the tubes in a bag, placed the bag in a box, and gave the box to another officer. The officer who received the box testified that he took the box to the police station and placed it in a refrigerated lockbox and placed the key to the lockbox in a location that could only be accessed by members of the police confiscation department. This officer testified about his understanding that samples left in the lockbox would be taken from the confiscation department to the TBI. A TBI agent testified about the procedure followed in the laboratory relative to samples received in the locked dropbox inside the TBI facility. *Pascasio Martinez*, 2017 WL 5613976, at *1-2. In considering the case before it, the *Pascasio Martinez* court analogized the facts of *Earnest Laning* and *Michael Joseph Arbuckle* and distinguished those of *Reginald Bernard Coffee*. The *Pascasio Martinez* panel noted an officer's testimony that the sample would have remained in the refrigerated lockbox until it was sent to the TBI. The panel also noted the TBI agent's testimony that if any evidence of tampering was observed when the sample was removed from the TBI's drop box, the file would contain notations and that the file in the present case contained no such notations. The *Pascasio Martinez* panel concluded that because the State established an adequate

chain of custody, the trial court did not err in admitting the evidence. *Pascasio Martinez*, 2017 WL 5613976, at *3.

Returning to the case at bar, we reiterate that the State failed to offer any evidence about the whereabouts and security of the Defendant's blood sample from the time Deputy Sulewski gave it to the Forensic Department until it was received in the TBI Laboratory's evidence drop box six days later. Unlike *Earnest Laning* and *Michael Joseph Arbuckle*, but like *Reginald Bernard Coffee*, the State did not offer evidence of the sheriff's department's usual procedures for storing, securing, and transporting evidence. Thus, we reject any persuasive value the State assigns to the decisions cited in its brief.

The question which remains is whether the Defendant is entitled to relief as a result of the error. The convictions of DUI per se and fourth-offense DUI based upon a per se violation both rely upon the blood-alcohol test results as the essential proof regarding intoxication. *See* T.C.A. §§ 55-10-401(a)(2) (2013) (amended 2015), 55-10-402(a)(4) (2013) (amended 2014, 2015, 2016). The erroneously admitted blood-alcohol concentration evidence was essential to the State's case on these counts. Regarding the DUI and fourth-offense DUI convictions based upon impairment, we note that the evidence of the Defendant's intoxication, aside from the blood-alcohol content evidence, included Deputy Sulewski's testimony about his encounter with the Defendant and the video recording of the Defendant's demeanor and performance on the field sobriety tests. We note that although the video recording is probative of the question of impairment, it is not dispositive. The record reflects that the jury was instructed that it could infer from proof of a blood-alcohol test result of 0.08 percent or more that the Defendant's ability to drive was impaired to a sufficient extent to constitute a violation of the DUI law. *See id.* § 55-10-411(a) (2013) (amended 2016). Given the significance of the blood-alcohol content evidence and the less-than-dispositive nature of the video evidence, we cannot conclude that the trial court's erroneous admission of the blood-alcohol evidence was harmless as to the counts which charged DUI by impairment and fourth-offense DUI by impairment. We conclude that we must reverse both counts of DUI and both counts of fourth-offense DUI and remand for a new trial.

As we stated in footnote 1, the Defendant has not challenged the trial court's ruling on his motion to suppress the blood-alcohol content evidence, and our ruling is based solely upon his challenge to the court's evidentiary ruling at the trial. As such, our decision does not preclude the State from offering the blood-alcohol content evidence at a new trial, provided a proper chain of custody and other evidentiary prerequisites are shown.

Finally, we turn to the Defendant's driving on a cancelled, suspended, or revoked license conviction. Proof of impairment due to intoxication is not an element of this

offense. *Id*. § 55-50-504 (2013) (amended 2016). As to this count, the trial court's erroneous admission of the blood-alcohol content evidence was harmless.

## II

## Ineffective Assistance of Counsel

The Defendant contends that he received the ineffective assistance of counsel because trial counsel failed to review the video recording with the Defendant before the trial. The State responds that the trial court did not err in denying relief because the Defendant failed to establish his claim by clear and convincing evidence. We agree with the State.

Typically, ineffective assistance of counsel claims are raised in a post-conviction case following the conclusion of the conviction proceedings. *See* T.C.A. §§ 40-30-101 to -122 (2012 and Supp. 2017) (Post-Conviction Procedure Act). Occasionally, these claims are raised at the motion for new trial and in the appeal of the conviction proceedings, although this practice is "fraught with peril." *See State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992) (quoting *State v. Jimmy L. Sluder*, No. 1236, 1990 WL 26552, at *7 (Tenn. Crim. App. Mar. 14, 1990), *perm. app. denied* (Tenn. July 16, 1990)). In the present case, the Defendant raised the issue, through newly appointed counsel, at the motion for a new trial, and the matter was fully litigated. At the hearing, newly appointed defense counsel acknowledged the general practice of raising ineffective assistance of counsel claims in post-conviction proceedings and stated that relief was "better sooner rather than later."

To establish that a defendant received the ineffective assistance of counsel in violation of the Sixth Amendment, a defendant has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a defendant must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The trial court must determine if these acts or omissions, viewed in light of all of

-12-

the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A defendant "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A trial court's findings of fact relative to an ineffective assistance of counsel claim are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A trial court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

The Defendant testified that he asked trial counsel to show him the video recording but that he never saw it until the trial. The trial judge accepted this aspect of the Defendant's testimony, observing, "I have no reason to disbelieve [the Defendant] that [trial counsel] didn't show him the video prior to the trial." The court found that this failure constituted deficient performance.

In considering whether the Defendant established prejudice as a result of trial counsel's inaction, the trial judge did not credit the Defendant's testimony that he would have pleaded guilty if he had been aware of the contents of the video recording. The judge explained his reasoning as follows:

> Where I think the defense has failed is in showing that he would have, in fact, accepted the plea offer.
>
> I know [the Defendant] says now that he would have, but during the trial if the video was played, he did not—or at least his lawyer never asked to go back and revisit the plea offer after seeing that. He didn't say anything to her or at least he didn't testify that he said anything to her about that.
>
> In addition, reviewing my notes of the record, which are not as complete as a transcript, but I take pretty good notes during a trial, indicated that the video was not that impactful. In fact, [trial counsel] used

-13-

the video to assist [the Defendant] in his defense. She pointed out on cross-examination of the officer [who] did the field sobriety tests all the things that [the Defendant] did right on the video. And my notes indicated that it was not such a clearcut [case] where he's falling down drunk like a lot of folks do, and in fact, the video was used in his defense to show, well, he actually is staying on a straight line when he was walking.

In addition to that, we have the blood alcohol content, which, as [the prosecutor] points out, wasn't part of the—wasn't really affected by the video, and so [the Defendant] knew what the blood alcohol content was on there, and you know, I've seen cases where—where the blood alcohol content has been higher and people are still found not guilty, and—and you know, quite frankly, a lot of that is how they look on the tape.

In his particular case, I don't think it was so egregious that—that [the Defendant] looked so intoxicated that that really played as big a role as the blood alcohol content, and [trial counsel] did, in fact, tell him what the potential punishment was that he'd be facing should he to go trial, and so I think that the decision not to go to trial was [the Defendant's].

I think [trial counsel] presented him [with] all the possibilities. I think that she was well prepared for the trial and—and put on a good defense for him, and I—when it comes down to it, I just—I think hindsight's 20/20. I think [the Defendant] thinks now had he seen it, it would have made a difference, but I don't think the proof supports that. I don't think even if she'd shown him the video that—that he would have taken the plea offer.

Thus, the court found that the Defendant failed to establish prejudice and was not entitled to relief on his ineffective assistance of counsel claim.

Upon review, we conclude that the evidence does not preponderate against the trial court's factual finding that trial counsel did not show the recording to the Defendant before the trial. The record supports its determination that counsel performed deficiently in failing to review the video recording with the Defendant before the trial. The video recording was a significant component of the State's proof, and the State and the defense were at odds during the trial regarding the import of its contents to their respective cases.

Likewise, the evidence supports the trial court's factual finding that the Defendant would not have pleaded guilty if he had known of the recording's contents before the trial. The court rejected the Defendant's testimony in this regard, citing several factors it considered. Without a factual determination that the Defendant would have pleaded

guilty if he had seen the recording, the Defendant cannot establish prejudice. The record supports the trial court's determination that the Defendant did not show prejudice as a result of counsel's inaction. The trial court did not err in denying the Defendant's ineffective assistance of counsel claim.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings consistent with this opinion.

_____
ROBERT H. MONTGOMERY, JR., JUDGE